NOTICE
Decision filed 07/10/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230545-U

NO. 5-23-0545

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| ANDREW CARRINGTON and JEANNETTE CARRINGTON, | ) ) ) | Appeal from the Circuit Court of Madison County. |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | No. 20-MR-1292 |
| CHRISTINA BENOIT, | ) ) | Honorable Ronald J. Foster Jr., |
| Defendant-Appellee. | ) | Judge, presiding. |

JUSTICE MOORE delivered the judgment of the court.
Justices Boie and Vaughan* concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court's finding in favor of the defendant on the slander of title issue was against the manifest weight of the evidence where no evidence of malice was presented; however, the trial court did not err in finding that the plaintiffs had no claims pending at the time of trial. We therefore affirm in part and reverse in part.

¶ 2    The plaintiffs, Andrew and Jeannette Carrington, a married couple, appeal the Madison County circuit court's findings that they were liable for slander of title against the defendant, Christina Benoit, and that they had no pending claims at the time of trial. They also challenge the trial court's reasoned basis for appellate jurisdiction, although they do not challenge that this court does indeed have jurisdiction over this case. For the reasons that follow, we affirm in part and

---

*Originally Justice Welch was assigned to the panel. Justice Vaughan was later substituted on the panel and has read the briefs.

1

vacate and remand in part. We affirm the trial court's finding that the plaintiffs had no pending claims at the time of trial. We vacate the trial court's finding that the defendants were liable for slander of title against the defendant, and remand for further hearings on the malice element of the slander of title claim. We find that this court properly has jurisdiction over this case under Illinois Supreme Court Rule 303 (eff. July 1, 2017).

¶ 3                                                   I. BACKGROUND

¶ 4                                            A. Procedural Background

¶ 5      On November 30, 2020, this case was initiated by the plaintiffs filing a complaint seeking a declaratory judgment against the defendant related to a waterline easement along the southern property line of the defendant's property (Easement 2). On January 22, 2021, the defendant filed a counterclaim seeking a declaratory judgment against the plaintiffs related to Easement 2 as well as a separate claimed easement along the northern property line of the defendant's property (Easement 1). The counterclaim also alleged trespass by the plaintiffs and sought ejectment of the plaintiffs from the defendant's property. On October 27, 2021, the trial court granted the plaintiffs' attorney's motion to withdraw, and thereafter the plaintiffs proceeded *pro se*. On February 1, 2022, the defendant filed her first amended counterclaim.

¶ 6      In this counterclaim, the defendant brought 10 counts against the plaintiffs. First, the defendant sought declaratory judgment against the plaintiffs regarding Easement 1, asking the trial court to clarify the nature and extent of permitted uses of Easement 1, and to declare that the plaintiffs had exceeded those rights by spraying Roundup on the property and installing a roadbed, a pole light, landscape fabric, and other private utilities on the property. Second, the defendant alleged slander of title by the plaintiffs against her, contending that the plaintiffs' recording of a document entitled "Roadway Maintenance Agreement" had disparaged the title to her property.

Third, the defendant requested that the court quiet her property title by declaring that the "Property Road Maintenance Agreement" document was a cloud on her property's title and was void. Fourth, the defendant requested ejectment of the plaintiffs from Easement 1, asking the court to order the plaintiffs to remove all landscaping material from the easement area and to pay damages necessary for the property to be restored to its previous condition.

¶ 7 Fifth, the defendant alleged trespass by the plaintiffs on Easement 1, contending that the plaintiffs had trespassed by placing landscaping material on the defendant's property without the defendant's permission or any right to take such actions. Sixth, the defendant alleged negligent construction of the Easement 1 roadway by the plaintiffs, contending that the plaintiffs built the roadbed to a height above the existing topography, blocking the natural drainage of rainwater from the defendant's property across the easement area. Seventh, the defendant sought declaratory judgment against the plaintiffs regarding Easement 2, asking the court to clarify the nature and location of Easement 2, and to declare that the plaintiffs could not relocate the easement further onto the defendant's property. Eighth, the defendant requested ejectment of the plaintiffs from Easement 2, asking the trial court to order the plaintiffs to remove their waterline to the extent it was located outside of the originally established Easement 2 area and to pay damages necessary for the property to be restored to its previous condition. Ninth, the defendant alleged trespass by the plaintiffs on Easement 2, contending that the plaintiffs had trespassed by placing their waterline on the defendant's property in a location outside of the permitted Easement 2 area. Finally, the defendant alleged negligent construction of the waterline by the plaintiffs, contending that, in relocating their waterline, the plaintiffs created ditches, tore up sod, and left the defendant's property in a damaged condition, which affected her ability to use and enjoy her property.

3

¶ 8      On February 22, 2022, the plaintiffs filed both a first amended complaint and a second amended complaint, to which the defendant responded by filing a motion to dismiss. The plaintiffs' first amended complaint asked the trial court to enforce Easement 1, and the second asked the court to enforce Easement 2. Per the court's order on July 27, 2022, the plaintiffs voluntarily withdrew their first and second amended complaints and were granted 21 days to file an amended pleading. However, the plaintiffs never filed any amended pleadings.

¶ 9      Instead, on August 17, 2022, the plaintiffs filed three separate motions seeking declaratory judgment. On September 14, 2022, the defendant filed her response to the plaintiffs' motions for declaratory judgment, explaining that, as the motions seemed "to be intended as Motions For Summary Judgment as to [the defendant's] First Amended Counterclaim," the defendant would respond to them as such. At the September 23, 2022, hearing on the plaintiffs' three motions, the plaintiffs confirmed that the three motions for declaratory judgment were indeed intended to be motions for summary judgment as to the defendant's previously filed counterclaim against them.

¶ 10      The trial court's September 23, 2022, written order states: "[The plaintiffs] have not filed an amended complaint and the only pending claim is [the defendant's] counterclaim." At no time during or prior to the trial did the plaintiffs seek leave or attempt to file any further amended complaint. The court therefore concluded that the only matter to be heard at trial would be the defendant's first amended counterclaim.

¶ 11                                B. Pretrial Hearings

¶ 12      On August 25, 2021, the trial court held a hearing on the defendant's motion for preliminary injunction regarding Easement 1. The attorneys agreed that Easement 1 referred to a purported 40-foot easement along the defendant's northern property line, which allowed for "quasi and public utilities and appurtenances." The attorneys also agreed that Easement 2, which was not

4

the subject of the hearing, referred to a purported 20-foot waterline easement along the defendant's southern property line. The defendant's attorney explained that there were two plats, the first being the "Cliff Gruner plat," which originally established an ingress and egress easement (Easement 1); and the second being the "Dixie Harr plat," which showed both the northern easement (Easement 1) as well as the southern easement (Easement 2). There were also three documents, the first being a document titled "Easement 1," which reserved the right of the grantor to shift the utility easement (Easement 2) to the locus of the access easement (Easement 1). The second document was titled "Easement 2." Finally, the defendant's attorney mentioned the "Private Road Maintenance Agreement" (PRMA), a recorded document which constituted "the crux of the matter."

¶ 13    The defendant's attorney alleged that the plaintiffs were "using [the PRMA] as a basis for constructing [a] roadway on the northern easement." The defendant's attorney noted that the PRMA had only been signed by Mr. Carrington and was "not signed by anybody who had a right to grant these permissions to Mr. Carrington." The plaintiffs' attorney argued that the PRMA and other documents had all been "recorded within a week or two of each other at closing" of the plaintiffs' house purchase. The plaintiffs' attorney pointed out that the plat for Easement 1 had been signed by the then owner of the servient land, Dorothy Cristel, on the same day that the plaintiffs signed the PRMA. The plaintiffs' attorney also alleged that the purchase contract, title insurance, and other documents had all similarly been signed that day. The trial court then confirmed with the plaintiffs' attorney that the plaintiffs' position was that this reflected "some sort of either incorporation or sufficient approval of it to merit the agreement by the servient tenement to the rights described" in the PRMA. The attorneys also confirmed that the PRMA had been recorded.

5

¶ 14    The defendant's attorney countered, arguing that the fact that the documents had been signed on the same day did not necessarily indicate agreement between the parties as to the rights asserted in the PRMA. The defendant's attorney argued that the easement was "defined by the first plat, which identifies it only as an ingress and egress" easement "for public and quasi-public utilities," and which does not "address roadways." The defendant's attorney stressed that "the only document signed by a grantor of the property that [addressed] ingress and egress [was] the plat, and that just [said] ingress and egress." The defendant's attorney argued that the PRMA entrenched upon the defendant's rights by allowing the plaintiffs "to install culverts *** [and] gravel." In addition, the defendant's lawyer argued, despite the PRMA stating that the typography could not be changed, and that the roadbed could not be raised over the elevation of the property, the land had been graded, and the culverts were insufficient to drain the property.

¶ 15    At this point, the attorneys argued about whether the construction of the roadway and its various appurtenances qualified "within a reasonable constraint of ingress and egress based upon" the plat and the Easement 1 document. The defendant's attorney maintained that the PRMA and construction of the roadway wrongly "expanded" upon the legitimate rights of the plaintiffs delineated in the plat and Easement 1 document. The plaintiffs' attorney countered by characterizing the PRMA as a "limitation" on the plaintiffs regarding what they "could actually put on that ingress/egress easement." The plaintiffs' attorney confirmed that the plaintiffs had installed a gravel driveway and three to four feet of landscaping on either side, which mainly consisted of mulch and trees. The plaintiffs' attorney argued that such landscaping qualified under allowed "appurtenances." The defendant's attorney countered that, in addition to "planting trees up and down the road," the plaintiffs had "sprayed Roundup, [killing his] client's grass." The trial court also challenged the plaintiffs' attorney's characterization of the mulch and trees as qualified

6

appurtenances to the easement, commenting that the purpose of the easement was ingress/egress, and that any appurtenance to the easement had to "pertain to the purpose of the grant," which neither mulch nor trees did. The court commented that it seemed like the plaintiffs believed that the PRMA gave "them an unfettered right to have that property in fee," and that they were "acting like they're fee owners of it." The plaintiffs' attorney agreed that the plaintiffs' actions were in line with "what a fee owner could do," but again argued that the easement gave them access, as well as the right to install appurtenances.

¶ 16    The defendant's attorney argued that the plaintiffs had a right to ingress and egress, but that they had violated the defendant's rights by raising the elevation of the land and changing the topography so that the land did not drain properly. The plaintiffs had also put two non-functioning culverts in, resulting in water "banking up" on the defendant's property, and rendering her property unusable. The defendant was unable to mow on her land, and her "use [and] enjoyment of the property now [had] been negatively affected." The defendant's attorney pointed out that, even though the defendant maintained that the PRMA was an invalid document, the PRMA itself prohibited road elevation above existing ground elevation or road elevation that caused water damming to occur. The attorneys and the trial court then had a discussion off the record, after which the transcript ends. That same day, the court entered a written order stating that the parties had agreed on a temporary, non-prejudicial basis to limit the plaintiffs from intentionally entering onto and trespassing onto the defendant's property, except for on the permitted easements; and from using certain weed killers and trimming devices in their maintenance of the easement roadway.

¶ 17    The plaintiffs' attorney was granted leave to withdraw on October 27, 2021, and thereafter, the plaintiffs proceeded *pro se*. On February 22, 2022, the plaintiffs filed both a first amended

7

complaint and a second amended complaint, to which the defendant responded by filing a motion to dismiss. On July 27, 2022, the trial court held a hearing on the defendant's motion to dismiss. The first amended complaint addressed a separate issue from the second amended complaint. The court expressed confusion over why the plaintiffs filed a first amended complaint the same day as their second amended complaint. The defendant's attorney surmised that "the second amended claim [was] the only claim [the plaintiffs had] because then it does away with the first amended claim," and that, as a result, "the matters of the first amended complaint [were now] moot, and now [they were] only dealing with matters of the second amended complaint." At this point, Mr. Carrington interjected, offering "to withdraw the first and second claims," and to "refile another claim altogether." The court therefore granted the motion to dismiss, dismissed both the plaintiffs' amended claims, and granted the plaintiffs leave to refile within 21 days. The defendant's attorney then clarified with the court that, although the plaintiffs' claims had all been dismissed at this point, the defendant still wished to proceed on her counterclaim regarding the declaratory judgment for the roadway easement. The court confirmed that it would "separate the claims and move forward with [the defendant's] declaratory judgment on the counterclaim[,] separate from [the plaintiff's claims] *** against [the defendant]."

¶ 18    The plaintiffs never refiled any claim within the 21 days allotted by the trial court. Instead, on August 17, 2022, the plaintiffs filed three motions for declaratory judgments regarding the easements. On September 14, 2022, the defendant filed a response to the plaintiffs' motions for declaratory judgments, as well as a cross-motion for partial summary judgment. On September 23, 2022, the trial court held a hearing on the plaintiffs' motions and the defendant's cross-motion. At the outset, the trial court confessed to harboring a "bit of confusion" since, at the last hearing, the plaintiffs had indicated that they would file an amended complaint, and the court had granted them

8

a specific period of time to do so. Instead, the court noted, "three motions were filed." The court asked Mr. Carrington to "enlighten the Court [on] what [he was] attempting to do." The court asked if "the three motions" constituted the plaintiffs' "amended complaint." Mr. Carrington answered in the affirmative and explained that he "thought this would be the quickest, most efficient way to do it."

¶ 19    However, just a little while later, the trial court again asked Mr. Carrington: "Just so I'm clear, so you are saying these aren't to be considered amended complaints? These are motions?" Mr. Carrington answered, "Yes." The court asked Mr. Carrington twice more to confirm that the motions were not amended complaints, but simply motions in response to the defendant's counterclaim, and both times, Mr. Carrington affirmed the court's understanding, answering: "That's correct," and "Yes." At this point, the defendant's attorney interjected, clarifying that "right now [the plaintiffs had] a motion filed," but that there was "no complaint on file by the plaintiffs," and that "the only filings *** then is the counterclaim." The court affirmed that "the only thing filed presently, based upon what [Mr. Carrington had] stated on the record, [was the defendant's] counterclaim." The court again stated that the plaintiffs' complaint was "gone," and the defendant's attorney similarly confirmed that the plaintiffs' complaint was "gone." The court again stated that "presently, Plaintiffs' claim [was] gone," seeing as they "did not file a complaint," and had "admitted [that] on the record."

¶ 20    The trial court confirmed that the plaintiffs' three motions were against the defendant's "counterclaim, which [was] the only claim now before the Court." Mr. Carrington at this point interjected, clarifying that the defendant had "filed a complaint," and that the plaintiffs' motions were meant as a "response" to that complaint. The court again clarified that its "understanding of what [Mr. Carrington was] attempting to do" was to file "motions against [the defendant's]

9

counterclaim." Mr. Carrington responded, "right," and admitted that the "additional amended complaint" that the plaintiffs had filed at the "last trial date" was "gone." Mr. Carrington inexplicably claimed that the plaintiffs' "response to [the defendant's] initial complaint [was] still in force." However, after poring over the record, this appellate court concludes that Mr. Carrington was either mistaken or confused in making this statement, as it was the plaintiffs that filed the initial complaint, not the defendant; and the plaintiffs had voluntarily withdrawn their last amended complaints on July 27, 2022, and had failed to refile any complaint, leaving no complaint of theirs pending.

¶ 21　　The trial court once again confirmed that the motions were "motions for summary judgment as to [the defendant's] counterclaim," and Mr. Carrington responded in the affirmative. The court clarified once more that it was "not to construe these [motions] as complaints or complaint as [the plaintiffs] were previously ordered, but as motions against" the defendant's counterclaim. Mr. Carrington again responded in the affirmative. The hearing then proceeded on the plaintiffs' motions and the defendant's cross-motion. At the end of the hearing, the court confirmed that the plaintiffs "never filed a Complaint, as they were ordered to do," and, as a result, their three filed motions were "strictly being treated as Motions for Summary Judgment."

¶ 22　　The trial court's September 23, 2022, written order states: "[The plaintiffs] have not filed an amended complaint and the only pending claim is [the defendant's] counterclaim." This order was signed by both plaintiffs, as well as the defendant. At no time prior to the trial did the plaintiffs seek leave or attempt to file any further amended complaint. The trial court therefore concluded that the only matter to be heard at trial would be the defendant's first amended counterclaim.

¶ 23                                   C. Trial

¶ 24     In March 2023, a three-day bench trial was held on the defendant's counterclaim against the plaintiffs. At the outset, the court clarified that, since the plaintiffs had never refiled any complaint, "the only matter before the court [was] the counterclaim of Ms. Benoit against Mr. and Mrs. Carrington." Therefore, the court stated that the defendant's counterclaim against the plaintiffs would be the only claim tried. At this point, Mr. Carrington seemed confused and inquired on whether he would be able to "present witnesses to corroborate" an alleged past order, an issue (irrelevant to this appeal) which had already been handled at a prior hearing. The defendant's attorney clarified for the record:

> "Your Honor, I think if this Court recalls, the Carringtons were given leave to amend the complaint. They never did. They filed some motions which this Court deemed as motions for summary judgment, and I believe that they acknowledged that.
>
> And the Court order since then [has] been very clear that the Carrington's complaint has been dismissed, and the only matter before this Court now is Ms. Benoit's counterclaim. That's been this Court's stance. That's based upon the Court orders we've had for many months now."

¶ 25     The trial court agreed, recalling that, per its July 27, 2022, order, the plaintiffs had been "given 21 days to file an amended complaint. They failed to file that. Instead, they filed three motions August 17th. At the hearing, they indicated on the record that those three motions were motions for summary judgment as to the counterclaims filed by [the defendant]." The court again confirmed that, as a result, the "only matter pending before this Court is Ms. Benoit's claim against the Carringtons." In total, 12 witnesses testified at trial. For the sake of brevity, we only recount the testimony relevant to this appeal.

11

¶ 26                                    1. Day 1

¶ 27     On the first day of the trial, March 1, 2023, Carrington testified that he and his wife lived at 5084 Old Carpenter Road, in Edwardsville, IL, and that his property was just to the west of the defendant's property. He confirmed that one of the issues was "a 40 foot wide ingress and egress easement that goes across the northern border of the Benoit property." Carrington testified that, from 2013 until recently, the Carringtons had accessed their property using "the primary access" point, a private road named Shadowfax Drive. Until recently, Shadowfax Drive had been the only road access to the Carringtons' property.

¶ 28     Carrington confirmed that the Cliff Gruner plat had been signed by the Gruners, the previous owners of the Carringtons' lot, and Dorothy Cristel, a previous owner of Benoit's lot. Carrington confirmed that the description of the easement listed on the plat, the easement owner's certificate, and the deed was of an "ingress and egress easement." Carrington confirmed that the Easement 1 document had language that granted rights only to public and quasi-public utilities and appurtenances but contended that the word 'appurtenances' was "very broad" and included "things such as gravel, trees, [and] landscaping material." Carrington testified that "the language that was provided was sufficient to indicate to" him and his wife "that [they] could put gravel or pavers or landscaping or shrubs on the 40 foot easement once the private road was installed." Carrington testified that he and his wife used 20 feet of the northern easement for the gravel and 10 feet on each side for landscaping to control weeds. They did this because they "had agreed with the property sellers at the time that [they] would upgrade the gravel to pavers after [some] time."

¶ 29     Carrington was unsure who prepared the PRMA but believed that it had been prepared by "Cliff [Gruner] or an agent of his," since Cliff had "indicated to [them] that he did, and [Carrington had] no reason to doubt him." Carrington also added that his and his wife's "warranty deed

12

indicated that Cliff Gruner executed" the PRMA. Carrington testified that he "had no involvement" in the preparation of the PRMA. He testified that it "was given to [him] to be signed, and [he] signed it because it agreed what [they] had discussed," that the Carringtons "would be solely responsible for the maintenance of the road once it was installed." Carrington believed the PRMA granted him and his wife "certain rights as to how [they could] use the ingress and egress easement," and mandated that they "maintain the easement." He confirmed that, although the PRMA stated that it indicated an agreement "by and between the undersigned parcel owners and users," the only signature on the PRMA was his. Carrington believed that Cliff Gruner provided him the rights in the PRMA but confirmed that Gruner's signature was not on the document. He confirmed that it was Cristel, and not Gruner, who "owned the property over which the easement was placed." He testified that his "warranty deed [said] it was executed by Cliff Gruner, it was presented to [them] for signature, and that's what [he] did."

¶ 30    Upon questioning, Carrington clarified that, when referencing the PRMA's inclusion in the warranty deed, he had been referencing the "title insurance policy" document. He agreed that there was no reference to the PRMA in the warranty deed. He did not know who recorded the PRMA, despite trying "to find out or get a specific answer to that" question. Carrington testified that he had an email from Gruner's real estate agent to his real estate agent asking his real estate agent to get him "to sign this document and get it back to her." Carrington surmised that Gruner's real estate agent "may have on Cliff's behalf recorded it," but admitted that he did not know for sure.

¶ 31    Carrington confirmed that construction of the gravel roadway began around November 2020. He believed "they used the usual construction machinery" as well as some landscaping fabric and gravel. Carrington testified that "the Fort Russell Township came down and looked at the drainage and instructed [them] that [they] needed to put culverts in particular places, and *** gave

13

[them] the sizes," which they used in their construction. He claimed he "had no involvement in where [the culverts] needed to go," and "just followed their direction." Carrington recalled the contractor telling him that they would follow the existing topography of the land when laying down the gravel, although Carrington had originally wanted the road "to be completely flat." Carrington admitted that the workers "were taking and moving the grass and everything," and that "there was some dirt that came with the grass." Carrington admitted that the whole roadway "project was not paid for by anybody but [him]."

¶ 32    Carrington confirmed that he and his wife "also planted some shrub trees" as part of their "curb appeal project," which they "had discussed with the sellers at the time when [they] purchased the property." Carrington claimed that the trees were "very attractive" and "recommended" to them "to increase the curb appeal of the road." Carrington admitted that he did not need landscape material, mulch, or trees to drive his vehicle across the ingress and egress easement. Carrington admitted that he and his wife sprayed Roundup on the Benoit property to get rid of weeds in the easement. Carrington claimed they "used it no more than twice *** because at some point [Benoit] came out and *** said she had a problem with it." Carrington alleged that Benoit "got into [his] wife's face and said that it was a problem for her," at which point the Carringtons stopped using Roundup. Carrington admitted that Benoit never gave him or his wife permission to spray Roundup weed killer, install a gravel roadbed, place culverts, install landscape fabric, plant trees, or place mulch on her property. Carrington then continued to testify about the waterline easement along the southern border of the Benoit property.

¶ 33    James Cristel, a witness for the plaintiffs, testified that he built the house on 5084 Old Carpenter Road (now the Carrington property) and lived there from 2001 to 2013. Cristel testified that the whole subdivision had been owned by his father, who died in 1997. After his death, the

14

subdivision passed to his mother, Dorothy, who had since passed away. Cristel then bought 17.2 acres and built the Carrington house. Cristel confirmed that "all of this property which [had since] been subsequently parceled off and sold off *** [belonged] to [his] family." Cristel also confirmed that he lived in the Carrington house from the time he built it to the time it was sold to the Carringtons in 2013.

¶ 34   Cristel confirmed that he spoke to Dorothy about the 40 foot northern easement before selling his house to the Carringtons. Cristel told Dorothy that the Carringtons were willing to buy the house so long as there was a northern easement, "just in case someday [they want] to build [their] own driveway." Since Dorothy had since passed away, Carrington referenced her affidavit, dated September 10, 2021. In this affidavit, Dorothy stated that she provided the Carringtons "a 40 ft ingress and egress Easement 1" so that they could "construct their own private road along the north side of [her] property." The affidavit also confirmed her awareness that the Carringtons had wanted "to develop the private roadway with *** appropriate landscaping like mulch, trees, fences, entrance pillars and any other suitable appurtenances."

¶ 35   Cristel confirmed that, at the time of purchase, he did not indicate to the Carringtons "that there would be any restrictions on [their] usage of the road." At this point, Carrington stated: "Now, at the time when we were purchasing the property, the owner of record was Cliff Gruner on the title deed and various documents." Carrington explained that he had "discovered this email indicating that someone called Wanda Pourchot communicated with [the Carringtons'] real estate agent and said that [Carrington] needed to sign a particular document." Carrington explained that the document was the PRMA. Cristel testified that Pourchot was "the saleslady for that realtor company that was representing to sell the house."

15

¶ 36    Carrington admitted into evidence Cliff Gruner's evidence deposition, dated November 11, 2022, since Gruner had since passed away. Carrington pointed out that, in his evidence deposition, Gruner answered in the affirmative when asked whether he or his agent executed the PRMA. Carrington also pointed out that, when asked why only Carrington's signature was required on the PRMA, Gruner answered: "The attorney told us that's all we needed." Gruner admitted that there was nothing in the Easement 1 document that allowed for a "private road." However, Gruner confirmed that Easement 1 was referred to in the Easement 2 document as "the 40 foot wide utility and roadway easement."

¶ 37                                    2. Days 2 and 3

¶ 38    The next day, March 2, 2023, the bench trial resumed.

¶ 39    Christina Benoit then testified. Benoit testified that she lived at 5090 Old Carpenter Road, which she purchased from Dixie Harr at the end of July 2020 for $172,000. When she purchased the property, Benoit had intended to keep a mini farm. She wanted horses and sheep, and already had chickens, turkeys, and ducks. Benoit explained that the property "already had stables and a barn on there," and that the purchase seemed like "a great opportunity *** to get horses." Her "intention was to fence the whole back pasture for the horses and keep the front up for the chickens and ducks and turkeys separate." Benoit clarified that the "back pasture" was separated from the main part of her property by the northern easement. When Benoit first purchased the property, she had no issues with standing water or muddy spots, and she was able to use her zero turn mower to mow the whole property. When it rained, water would flow from the south to the north, across the northern easement.

¶ 40    Benoit recalled that, around December of 2020, "a contractor came out and started taking dirt and pushing dirt around and constructing a driveway" along the northern easement area. She

16

had not been given advance notice that this work would be commencing, nor did she give permission for such work to occur. After construction began, after any kind of rainfall, the water would not flow like it did before. Instead, it sat and became "impassable to walk through." Benoit understood the gravel roadway to be raised above the normal level of her property. Benoit testified that now that the roadway had been constructed, even with the culverts in place, after rainfall, her property became a "muck" and a "mess." Benoit complained that she could not "cut the property," and that if she walked back across that area of her property, she would "sink" due to the water saturation in that area.

¶ 41    Benoit testified that, before the roadway construction, her property had been "nice, green, smooth." Now, however, it was "nothing but weeds" because she could not mow properly. When she attempted to mow the back pasture, her zero turn mower would become stuck in the mud and had to be pulled out by her truck. She had to resort to asking her neighbors to borrow their tractors. Benoit testified that "any time there [was] a decent amount of rain," there accumulated enough standing water on her property to where there were "frogs living in it." According to Benoit, the property "never fully drained." Benoit testified that she saw Mrs. Carrington spraying Roundup all along the easement, and that, despite asking the Carringtons not to spray Roundup on her property, and despite telling them her concerns with their doing so, they continued. Ultimately, Benoit testified, she "had to get an order for them to spray a nontoxic chemical" on her property. Benoit testified that the Carringtons placed landscaping fabric, trees, and mulch on both sides, all the way up and down the easement strip on her property.

¶ 42    Benoit testified that, to get to the northern stub of her property, she had to "drive over the mulch and everything to get to that side," and that what the Carringtons had installed had materially "interfered with [her] use and ability to use that northern stub." Benoit recalled that, on one

17

occasion, she "had approached Mrs. Carrington because she was spraying the Roundup, and she told [Benoit] to get off of her property." This happened on the gravel drive on the easement on Benoit's property. Another time, the Carringtons "claimed that [Benoit] damaged their mulch" because she had to drive her zero turn mower across the easement to get to the northern stub of her property, and the mower dragged mulch across the road as it went. A contractor had also advised Benoit that the Carringtons wanted to put a gate up, which Benoit did not consent to. Benoit also recalled a conversation she had with the Carringtons before she closed on her property wherein the Carringtons told her that she had been "lied to on how much property [she] was getting," because "their property was on there."

¶ 43    Benoit testified that the easement was used not only by personal vehicles, but by trash trucks and delivery vehicles. As a result, Benoit had "to watch [her] animals more closely," and the use of the easement hindered her "ability potentially with [her] horses." Benoit confirmed that at no point did she ever give the Carringtons permission to install a raised gravel road bed, spray Roundup, install landscape fabric, plant trees, or put mulch on her property; nor did she ever sign any document to that effect. Benoit alleged that, at one point, the Carringtons had the power company "out there messing with the pole, and [she] saw Mr. Carrington walk out to them, and that night [she] found out that they had taken the light off of [her] power and put it on Mr. Carrington's power so they [could] have it on" instead of her. She testified that "at least half" of her property's use and enjoyment had been affected by the Carringtons' use of the easements. Benoit also testified about several disputes she and the Carringtons had over the southern waterline easement.

¶ 44    Andrew Carrington then took the stand himself and gave a narrative. Carrington testified that he and his wife purchased their property at 5084 Old Carpenter Road in 2013. Initially, it was

18

intended to be a development property to build wealth for his family. Carrington and his wife wanted their own private road, which he testified they had been granted. When they purchased the property, the Carringtons were given two easements, the 20 foot utilities easement and a 40 foot road and public utilities easement, the latter of which the Carringtons built their private road on. In 2018, Carrington approached Dixie Harr, the then-owner of the Benoit property, and "indicated that it was time to resolve this conjoined water utilities situation." However, Harr and the Carringtons were never able to reach an agreement. Carrington testified that his and his wife's "easements [were] completely valid," and that they had "not abused the rights that were pertained to [them]."

¶ 45    In 2020, after Benoit purchased her property, "problems" began to arise. Carrington testified that he "had told them beforehand that [he and his wife] did have these easements *** [and] what they were." Carrington alleged that "from the time [he and his wife] installed the private road until now, [they had] been harassed at every turn." He considered the "statements made by [Benoit] to be completely untrue," and denied ever claiming that the easement was his and his wife's property. Carrington described how he and his wife had "paid an additional sum of money to obtain" the easement. At the time of purchasing the easement, the Carringtons had made it known that they were planning to use "landscaping to enhance the curb appeal of [their] property."

¶ 46    Carrington testified that once he "realized that [Benoit] had an issue with the type of weed killer" he had been using on the easement, he "spent quite a bit of time researching an alternative that would be suitable to her," and the parties decided on an alternative. However, Benoit "did confront [him] again another time when [he] was using it [and] threatened to beat [him]." After this "totally unexpected" and "unfortunate" encounter, Carrington "came home and called the police." Carrington concluded by emphasizing that he believed he and his wife had "not in any

19

way [abused] or [exceeded] the rights that were granted onto [them] by the easements" that they had. At this point, the evidence was closed. After closing arguments took place the next day, March 3, 2023, the trial court took the matter under advisement.

¶ 47                                    D. Posttrial Proceedings

¶ 48    On March 30, 2023, the trial court issued its written order. In this order, the court found for the defendant on count II (slander of title as to the PRMA). The court found that the PRMA was a void document, and that its recording constituted a slander of the defendant's title, thereby allowing an award of damages, including attorney fees, to the defendant. As part of its reasoning, the court wrote:

> "With the Private Road Maintenance Agreement being signed by no one other than the Counter-Defendant, and such document being recorded in the chain of title, Counter-Defendants knew, or should have known, that recording the Private Road Maintenance Agreement was a false and malicious publication, performed with a knowing or reckless disregard to the truth, creating a cloud on Counter-Plaintiff's title and with the Counter-Plaintiff's title to her property suffering damages therefrom."

The court cited *Home Investments Fund v. Robertson*, 10 Ill. App. 3d 840, 844 (1973), which stated that, since slander of title actions involved "the element of malice," recovery was permitted for "costs and attorney's fees which directly [flowed] from the wrongful disparagement."

¶ 49    The trial court found for the defendant on counts I (declaratory judgment), III (quiet enjoyment), IV (ejectment), V (trespass), and VI (negligent construction), all of which pertained to the northern easement. The court also found for the defendant on count VII (declaratory judgment), and for the plaintiffs on counts VIII (ejectment), IX (trespass), and X (negligent construction), all of which pertained to the southern waterline easement.

20

¶ 50     After the judgment was amended on April 11, 2023, the trial court found that the plaintiffs owed the defendant $46,072.50 in attorney fees under count II (slander of title as to the PRMA) and $2,500 in damages under count V (trespass), for a total of $48,572.50. The court also stated in this order that it would "retain jurisdiction of this case to enforce the fulfillment of the legal and equitable obligations that have been ordered by [the] court."

¶ 51     On May 2, 2023, the plaintiffs filed their motion to reconsider. In this motion, which is rather convoluted and disorganized, the plaintiffs appeared to argue that, despite their voluntary withdrawal of both their amended claims on July 27, 2022, they had never meant to withdraw their original complaint, and had believed it was still in effect at the time of trial; that the evidence at trial had proved the claims in their initial complaint; and that the PRMA was a valid document that should not be voided. The plaintiffs asked the trial court to vacate its previous findings in favor of the defendant on counts I through VII, and to instead find in favor of the plaintiffs on those counts. On May 26, 2023, the plaintiffs retained counsel to represent them in the remaining proceedings.

¶ 52     On June 14, 2023, the trial court held a hearing on the plaintiffs' motion to reconsider. At this hearing, the plaintiffs' attorney argued that the court's finding that the filing of the PRMA constituted slander of title was in error because "a required element of slander of title is malice," and "there was no evidence of malice in the transcript." He argued that the court could not interpret malice into the evidence on its own; evidence of malice had to be directly presented at trial. Additionally, the plaintiffs' attorney argued, "the only evidence to establish something that [constituted] a slander of title [was] the filing of the [PRMA], and that was not filed by" the plaintiffs. He pointed out that most of the evidence at trial suggested that it was Dorothy Cristel or her agents, not the plaintiffs, who filed the PRMA. He also emphasized that the plaintiffs believed "that it was proper" at the time of signing it.

21

¶ 53 The defendant's attorney argued that evidence of "a reckless disregard [as] to *** truth or falsity" could suffice as evidence of malice, and such evidence was presented at trial. The defendant's attorney pointed to the fact that the PRMA was "signed only by Mr. Carrington" and was a document in which "he [granted] himself rights as to what he [could] do on *** [the defendant's] property" as evidence of a reckless disregard for truth, and as such, as evidence of malice. He conceded that there was no "testimony that [the plaintiffs] recorded" the PRMA but argued that they were "involved" in its recording.

¶ 54 Next, the plaintiffs' attorney argued that the trial court had made an error regarding "the dismissal or alleged dismissal of the original complaint." He admitted that "part of the problem" was that the plaintiffs were *pro se*, and "things were done that normally would not have been done if an attorney was involved in a case." The plaintiffs' attorney argued that the court's June 27, 2022, order was "crystal clear that the only thing being dismissed [was] first amended claim 1 [and] first amended claim 2." The attorney admitted that the September 23, 2022, order included that, since the plaintiffs had not filed an amended complaint, "the only pending claim [was] [the defendant's] counterclaim." The attorney expressed that he was "upset" on behalf of the plaintiffs because he believed the court "had not ruled on that," and that the court was therefore wrong to "put it in an order and *** say this [was its] ruling, especially when [his] client [was] unrepresented." The attorney claimed that the "whole argument that filing an amended complaint abandons the prior complaint [was] technically an appellate argument," and had "nothing to do with trial court." He also argued that the plaintiffs "had no intent of abandoning" their original complaint when they filed their amended claims but only meant "to add claims to this lawsuit."

¶ 55 The defendant's attorney pointed out that "the orders that [were] written were explicit to make sure the [plaintiffs] understood what their legal position was." The attorney emphasized that

22

"the [plaintiffs] were [present] on all of these arguments. They heard them. They saw these orders. They signed the order on September 23rd." The attorney expressed his belief that "the court went beyond what was necessary to make sure the [plaintiffs] understood that they didn't have a claim because they had not yet filed an amended pleading." The attorney argued that the plaintiffs "had every opportunity to come in and file and they did not." The attorney recounted that the plaintiffs' "amended pleadings for easement one and easement number two *** fully encompassed the prior complaint," and asserted that "the filing of [the amended pleadings] is what abandoned or withdrew their prior pleading." The court took the matter under advisement. On June 27, 2023, the trial court issued a written order denying the plaintiffs' motion to reconsider.

¶ 56 On June 23, 2023, the plaintiffs filed an amended motion for sanctions against the defendant (amended from their original motion for sanctions, filed on August 9, 2021). On July 10, 2023, the plaintiffs filed a motion to withdraw their amended motion for sanctions and for an order from the trial court that there were no further claims pending. In her July 11, 2023, reply to that motion, the defendant agreed to the plaintiffs' withdrawal of their motion for sanctions, but objected to their motion for an order from the trial court stating that there were no further claims pending. The defendant argued that, since the trial court's March 30, 2023, order required the plaintiffs to "perform specific actions by specific dates," and these actions had "not been completed," it would be inaccurate for the court to state that there were no further claims pending. The plaintiffs responded in a July 13, 2023, memorandum, arguing that "enforcement [could not] be a claim."

¶ 57 On July 14, 2023, the trial court held a hearing on the plaintiffs' motion to withdraw their motion for sanctions and for an order from the trial court that there were no further claims pending. At the hearing, the defendant's attorney argued that, since the court's April 11, 2023, order

23

"retained jurisdiction to enforce the legal and equitable claims in this" case, which the attorney believed included "regrading and removing all the gravel drive, removing the culverts, removing the trees, [and] removing the landscape," it would be improper for an order to include language that there were no further claims pending. The plaintiffs' attorney argued that there was "no legal basis whatsoever" for the defendant's position, and that there were "no claims left in this lawsuit," as "enforcing a judgment is not a claim." The parties eventually agreed to the court including Illinois Supreme Court Rule 304 (eff. Mar. 8, 2016) language in the order, so the plaintiffs could appeal. Later that day, the court issued a written order granting the plaintiffs' motion to withdraw their motion for sanctions and making "an express finding under Rule 304(a) that there [was] no just reason for delaying enforcement or appeal." This appeal followed.

¶ 58                                  II. ANALYSIS

¶ 59    On appeal, the plaintiffs challenge the trial court's judgment on count II of the defendant's counterclaim, slander of title. The plaintiffs argue that the trial court's finding that they were liable for slander of title was against the manifest weight of the evidence, as the defendant failed to provide sufficient evidence of malice, a required element of a slander of title action. The plaintiffs also argue that the trial court erred in ruling that they had no claims pending at the time of trial, as their original complaint was never formally dismissed, they did not complete the amendment process, and they never intended to abandon their original complaint. Finally, while both parties agree that this appellate court has jurisdiction over this case, they disagree on whether it has jurisdiction under Rule 303 or Rule 304. We first address jurisdiction.

¶ 60                        A. Jurisdiction of the Appellate Court

¶ 61    While both parties agree that this appellate court has jurisdiction, they disagree on whether jurisdiction is proper under Rule 303 or Rule 304. We review our jurisdiction *de novo*. Under Rule

24

303, a case that has not disposed of all 'claims' may not be appealed unless there is specific language included in the order under Rule 304(a). See Ill. S. Ct. R. 303(a)(1) (eff. July 1, 2017). The plaintiffs argue that all 'claims' were disposed of by the trial court's final order of March 30, 2023, and amended final order of April 11, 2023. The defendant disagrees, pointing to the fact that, in the amended final order, the trial court expressly retained jurisdiction for enforcement purposes.

¶ 62    On this count, we agree with the plaintiffs that a 'claim' with respect to an appeal has legal significance, and that enforcement of a judgment cannot be a 'claim.' At the time of the trial court's final order, no legal 'claims' remained pending. Therefore, this court has jurisdiction under Rule 303.

¶ 63    However, this court agrees with the trial court's decision to take the precautionary measure of adding Rule 304(a) language to its final order, given that the parties disagreed on jurisdictional grounds. We similarly understand the defendant's attorney's concern regarding appellate jurisdiction, as the trial court's amended final order expressly retained jurisdiction for enforcement purposes. Regardless, we find that this appellate court properly has jurisdiction over this case under Rule 303.

¶ 64                              B. Claims Pending at Trial

¶ 65    The plaintiffs argue that the trial court erred in ruling that they had no claims pending at the time of trial, as their original complaint was never formally dismissed, they did not complete the amendment process, and they never intended to abandon their original complaint. We disagree and find that the trial court did not err in ruling that the plaintiffs had no claims pending at the time of trial. We review this issue *de novo*.

¶ 66    In support of their argument, the plaintiffs repeatedly cite *Safeway Insurance Co. v. Ebijimi*, 2018 IL App (1st) 170862. In *Safeway*, the defendants filed a counterclaim against the plaintiffs. They were later granted leave to withdraw that counterclaim and file an amended counterclaim in its place. They did neither. Despite that fact, the trial court found that, when leave to withdraw and refile had been granted, the original counterclaim had been automatically withdrawn. The First District Appellate Court disagreed, ruling that "it is the filing of an amended pleading that withdraws the previous pleading," not the granting of leave to file. *Id.* ¶ 64. Since the defendants "had never acted on the order allowing them to file an amended counterclaim," the First District found that their original counterclaim had still been pending and had been improperly dismissed by the trial court. *Id.*

¶ 67    The plaintiffs argue that *Safeway* is analogous to the case at bar, in that the plaintiffs never completed the amendment process. However, the plaintiffs misinterpret *Safeway*. In the case at bar, unlike in *Safeway*, the plaintiffs *did* file an amended complaint—in fact, they filed two on the same day. As *Safeway* makes clear, "it is the filing of an amended pleading that withdraws the previous pleading." *Id.* The filing of the amended complaints on February 22, 2022, automatically resulted in the withdrawal and replacement of the original complaint. The plaintiffs' later voluntary withdrawal of their amended pleadings on July 27, 2022, could not and did not resurrect the original complaint.

¶ 68    Furthermore, the record reveals that the plaintiffs were informed several times by the trial court that their original complaint had been withdrawn; confirmed to the court that their subsequent motions were not to be construed as amended complaints, but as motions; and signed off on the September 23, 2022, order, which explicitly states the following: "[The plaintiffs] have not filed an amended complaint and the only pending claim is [the defendant's] counterclaim."

26

¶ 69    At the September 23, 2022, hearing on the plaintiffs' motions for declaratory judgments, the trial court recounted that, on July 27, 2022, after the plaintiffs had voluntarily withdrawn their first two amended complaints, the trial court had given the plaintiffs 21 days to file a third amended complaint. Instead, the court noted, "three motions were filed." After some initial confusion, the trial court asked Mr. Carrington to confirm that their motions were not "to be considered amended complaints," but simply motions in response to the defendant's counterclaim. Mr. Carrington confirmed that this was the case. The court asked the plaintiff twice more to confirm that the motions were *not* to be considered amended complaints, but simply motions in response to the defendant's counterclaim, and both times, Mr. Carrington affirmed the court's understanding, answering: "That's correct," and "Yes."

¶ 70    Throughout the hearing, both the trial court, as well as the defendant's attorney, asked several times for clarification from the plaintiffs, as to be sure that the filing of motions, and not amended complaints, was their intention. Mr. Carrington confirmed several times that this was the case. At the end of the hearing, the court confirmed that the plaintiffs "never filed a Complaint, as they were ordered to do," and, as a result, their three filed motions were "strictly being treated as Motions for Summary Judgment." Both plaintiffs signed off on the written order explicitly confirming the same. At no time prior to the trial did the plaintiffs seek leave or attempt to file any further amended complaint. We therefore affirm the trial court's finding that the plaintiffs had no claims pending at the time of trial.

¶ 71                              C. Slander of Title

¶ 72    Lastly, the plaintiffs argue that the trial court erred in finding them liable for slander of title against the defendant because there was insufficient evidence of malice, a required element of the claim. In a bench trial, it is the function of the trial judge to weigh the evidence and make findings

27

of fact. Following a bench trial, a court will not reverse the judgment of the trial court unless the judgment is against the manifest weight of the evidence. *Dargis v. Paradise Park, Inc.*, 354 Ill. App. 3d 171, 177 (2004). A judgment is against the manifest weight of the evidence when an opposite conclusion is apparent, or when findings appear to be unreasonable, arbitrary, or not based on the evidence presented. *Smith, Allen, Mendenhall, Emons & Selby v. Thomson Corp.*, 371 Ill. App. 3d 556, 558 (2006).

¶ 73    Slander of title is "a false and malicious publication, oral or written, of words which disparage a person's title to property resulting in special damages." *Whildin v. Kovacs*, 82 Ill. App. 3d 1015, 1016 (1980). "A cause of action for slander of title requires proof that (1) the defendant made a false and malicious publication, (2) the publication disparaged the plaintiff's title to property, and (3) the publication caused damages to the plaintiff." *Bozek v. Bank of America, N.A.*, 2021 IL App (1st) 191978, ¶ 87. The act of *maliciously* recording a document is the foundation of this claim. See *Whilden*, 82 Ill. App. 3d at 1016.

¶ 74    To prove malice, a plaintiff must show that the defendant knew that the disparaging statements were false, or that the statements were made with reckless disregard of their truth or falsity. *Chicago Title & Trust Co. v. Levine*, 333 Ill. App. 3d 420, 424 (2002). A defendant acts with reckless disregard if he publishes the allegedly damaging material despite a high degree of awareness of its probable falsity, or if he has serious doubts as to its truth. *Gambino v. Boulevard Mortgage Corp.*, 398 Ill. App. 3d 21, 62 (2009). Additionally, Illinois law is clear that malice cannot be inferred into the evidence. In *Whilden*, the First District Appellate Court wrote that the fact that the defendants filed a document without legal justification was insufficient to establish malice. *Whilden*, 82 Ill. App. 3d at 1017. In fact, the First District wrote, "if the party who records the document has reasonable grounds to believe that he has title or a claim to the property, he has

not acted with malice." *Id.* at 1016. Indeed, "the law in Illinois is that if a party has reasonable grounds to believe that he had legal or equitable title or even a claim, then assertion of this claim does not amount to slander of title." *Midwest Glass Co. v. Stanford Development Co.*, 34 Ill. App. 3d 130, 135 (1975).

¶ 75    After thoroughly reviewing the record, we agree with the plaintiffs that the trial court's finding that they were liable for slander of title was against the manifest weight of the evidence. No evidence of malice on the part of the plaintiffs regarding the recording of the PRMA was ever presented to the trial court. In fact, a fair amount of evidence was presented that the plaintiffs had reasonable grounds to believe that the PRMA was a legitimate document. Mr. Carrington testified at trial that he was unsure who had prepared the PRMA but believed that it had been prepared by Cliff Gruner. He testified that the PRMA had been "given to [him] to be signed, and [he] signed it because it agreed what [they] had discussed." He testified that he believed the PRMA granted him and his wife "certain rights as to how [they could] use the *** easement."

¶ 76    Dorothy Cristel's affidavit stated that she provided the Carringtons "a 40 ft ingress and egress Easement 1" so that they could "construct their own private road along the north side of [her] property." Cristel's affidavit also confirmed her awareness that the Carringtons had wanted "to develop the private roadway with *** appropriate landscaping like mulch, trees, fences, entrance pillars and any other suitable appurtenances." Additionally, in his evidence deposition, Cliff Gruner answered in the affirmative when asked whether he or his agent executed the PRMA. Gruner also testified that "the attorney told" him that only Carrington's signature was needed on the PRMA. This is significant evidence that the plaintiffs did not act with malice, and we therefore find that the trial court's finding that the plaintiffs were liable for slander of title against the

29

defendant was against the manifest weight of the evidence. We reverse and remand only on the slander of title claim.

¶ 77                                 III. CONCLUSION

¶ 78     After thoroughly reviewing the record, we find that this court properly has jurisdiction under Illinois Supreme Court Rule 303 (eff. July 1, 2017); that the trial court's finding that the plaintiffs had no claims pending at the time of trial was not made in error, and is affirmed; and that the trial court's finding that the plaintiffs were liable for slander of title against the defendant was against the manifest weight of the evidence, and is reversed and remanded for proceedings consistent with this ruling on the slander of title claim.


¶ 79     Affirmed in part; reversed and remanded in part.